Filed 7/9/14  P. v. Diaz CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEXANDER DIAZ,<br><br>    Defendant and Appellant. | A136143<br><br>(Alameda County<br>Super. Ct. No. H50753) |

Defendant Alexander Diaz appeals from his conviction for, among other things, the willful, deliberate, and premeditated attempted murder of a Fremont motorcycle police officer, Patrick Brower.  The People contended defendant stole a van and, when spotted by Brower shortly thereafter, attempted to murder Brower by running him over with the van.  Defendant argues his conviction should be reversed because the court wrongly denied his second motion to suppress his interrogation statements about the incident, there was not substantial evidence that he acted against Brower in a willful, deliberate, and premeditated manner, the court gave an improper jury instruction on the subject that confused the jury, and he received ineffective assistance of counsel.  We conclude defendant's arguments lack merit and affirm the judgment.

**BACKGROUND**

In July 2011, the Alameda County District Attorney filed an information charging defendant with one count each of the theft of a van (Veh. Code, § 10851, subd. (a)), the grand theft of flat screen televisions and computers that were in the van (Pen. Code,

1

§ 487, subd. (a)),[1] and the willful, deliberate, premeditated attempted murder of Brower while Brower was engaged in the performance of his duty (§§ 187, subd. (a), 664). The attempted murder count included allegations that defendant personally inflicted great bodily injury upon Brower (§ 12022.7, subd. (a)) and used a deadly weapon, the van, in doing so (§ 1192.7, subd. (c)(23)). The information also included allegations that defendant had suffered a prior conviction for grand theft and served a prior prison term within the meaning of section 667.5, subdivision (b).

Prior to trial, defendant moved to suppress statements he made in the course of an approximately three-and-a-half hour interrogation by two detectives that began about nine hours after his arrest, contending that his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) were not adequately communicated, given, and understood. After conducting a section 402 hearing, the court denied the motion.

At trial, the prosecution presented a number of witnesses and other evidence, while the defense did not present any. The evidence was overwhelming that defendant stole the van in Fremont, California and a few minutes later, while stopped at the end of an alleyway that led to Warm Springs Boulevard with the van's wheels turned southward, saw Brower stopped a little north of him on the Boulevard median observing him. Defendant turned the van's wheels north and drove on a 45-degree angle across traffic lanes. He crashed the van directly into Brower and his motorcycle, then accelerated to force both back into a traffic pole on the far curb, badly injuring Brower. The principal issue at trial was whether defendant attempted to murder Brower in a willful, deliberate, and premeditated manner, as the prosecution contended, or crashed the van into him by accident, as the defense contended. We focus on the evidence that is relevant to this and the other issues defendant raises in this appeal.

On Monday morning, October 4, 2010, a man who delivered electronics products for CEVA Logistics drove his van, loaded with electronics products, to his first delivery, at a Fremont residence. He parked the van, which had "CEVA" signage on it, in the

---

[1] All statutory references herein are to the Penal Code unless otherwise stated.

driveway of the residence. He and a helper carried a large television set from the van into the residence, where they began setting up the television. About five minutes later, he went outside and discovered his van was missing. He called 911 and reported the theft. At trial he testified that he realized he did not have his van keys at the time. Dispatch notified officers in the field to be on the lookout for a white van with a "CEVA" company logo on its side.

### Brower's Testimony About the Incident

Brower testified that he was on routine motorcycle patrol in Fremont when he heard the broadcast about the stolen van. He was in full uniform and wearing both a white helmet with a badge on its front and a gun belt. His motorcycle was marked with the Fremont police seal on its gas tank and the word "Police" on its rear saddlebags, and its headlight was on.

Brower testified that he drove southbound on Warm Springs Boulevard, a five-lane road with three southbound and two northbound lanes, and yellow Bott dots running down the center median. He saw a white van with a "CEVA" logo ahead and to his left, stopped at the end of an alleyway that led to Warm Springs Boulevard. Brower stopped on the center median about 60 feet from the van and radioed dispatch that he had spotted the stolen van. He noticed the van's wheels were turned as if the driver was preparing to turn left onto Warm Springs Boulevard and drive southward, ahead of Brower, and saw the driver looking in that direction. Following department protocol, Brower planned to follow the van until patrol cars arrived because it was not safe for him to stop the van alone while on a motorcycle.

Brower testified that he saw the driver of the van look from left to right and then do a "double take" when he saw Brower. The driver stared directly at Brower, seeming panicked, and then looked around again in quicker movements. He turned the van's wheels from the left to all the way to the right, which Brower thought would have enabled him to turn onto the slow northbound lane. Brower, thinking the driver was going to turn right into the slow northbound lane of Warm Springs Boulevard, changed his plan. He decided he would drive a little more south, do a U-turn, and follow the van

3

as it drove northward.  He began moving his motorcycle slowly, just enough to keep it upright and in a position to move, and looked over his right shoulder for passing traffic. He heard an engine revving as if someone had pushed the accelerator pedal to the floor and quickly turned to his left.  He saw the van in the street about 25 feet away and heading directly towards him.  He did not have time to react and braced for the impact.

Brower said the van crashed into him, knocked him to the pavement, and caused his head to whip around, after which it sounded like the driver was still trying to accelerate as much as he could.  Brower saw the van was pushing the motorcycle and himself back towards a light pole on the curb.  Brower maneuvered at the last second to prevent his head from hitting the pole, and the van hit the pole and stopped.  Brower was pinned down under the motorcycle, in excruciating pain, and thought his left leg was broken.  He heard the van door open, feet hit the ground, someone run in a southbound direction, and a male voice yell for someone to "stop."  Someone ran up with a fire extinguisher and sprayed the bottom of the motorcycle and Brower, and Brower radioed for assistance, which soon arrived.  At trial, Brower said the driver was Hispanic and that defendant looked like him, but Brower was not 100 percent sure defendant was him.

Brower testified that he had numerous surgeries to repair a compound fracture to his left tibia, left toe, right knee, and arm.  Previously, he had run two to three miles a day, but at the time of trial was unable to run at all.  He was still undergoing physical therapy and unable to resume his police duties.

### *Other Eyewitness Testimony About the Incident*

Scott Bullis testified that at the time of the incident he was sitting in the front passenger seat of a car that had just turned onto Warms Springs Boulevard's northbound slow lane from a nearby parking lot.  It was a sunny day.  From a distance of about 100 to 150 feet, he saw a motorcycle police officer up ahead and to the left stopped in the middle of the roadway.  There were no cars between Bullis and the police officer.  A white cargo van came out of an alleyway up ahead and to Bullis's right and drove straight at the motorcycle officer, moving on a 45-degree angle north, across the traffic lanes.  It struck the officer and continued to accelerate across three lanes of traffic, then hit a light

4

pole on the curb. The motorcycle was on its side and the officer was pinned underneath it by the pole. Bullis could see the rear of the van just prior to and after impact, but did not see the van's brake lights turn on.

Bullis further testified that the van driver opened the van door and ran southward on Warm Springs Boulevard. Bullis shouted for the man to stop and help him help the trapped police officer, but the man did not. Bullis could see flames coming from the motorcycle. He rushed over and tried to pull the officer out, but could not. He shouted for someone to get a fire extinguisher and someone soon used one to extinguish the flames. At trial, Bullis identified defendant as the van driver.

Adam Kaufman testified that at the time of the incident he was in a car heading northbound in the fast lane of Warm Springs Boulevard. While stopped at an intersection for a red light, Kaufman saw a motorcycle officer stopped in the roadway 50 to 100 feet ahead of him. There were no cars between him and the officer. He saw a van come out of an alley to his right, hit the officer, and push him and his motorcycle back across three lanes of traffic and into a light pole without decreasing speed. The van did not brake as far as Kaufman could tell. The van's driver got out and ran away as the motorcycle caught fire. Kaufman said the driver appeared to be Hispanic, but Kaufman did not see him enough to identify him.

### Other Evidence Regarding the Incident

Evidence presented at trial indicated the van pushed Brower and his motorcycle back more than 68 feet, until they hit the light pole. A traffic specialist with the Fremont Police Department testified that he was able to recover computer data from the van's air bag control module, although the air bag was not deployed. The data indicated that the van's throttle was depressed to its maximum two seconds before the impact, and the miles per hour increased over several seconds from 10 miles per hour to 17 miles per hour. One second before the crash into the light pole, the van's speed increased to 19 miles per hour as the throttle returned to zero, meaning it was no longer being depressed. The brake sensor indicated that the brake pedal was not depressed during the time recorded. The van was tested, and its accelerator, steering wheel, and turning functions

5

were found to work. The traffic specialist found nothing would have prevented defendant from steering away from Brower or braking.

Defendant acknowledges that physical evidence presented at trial, including a cell phone found on the driver's side of the van containing photographs of defendant and a black jacket found nearby with two motel key cards in it, led the police to other evidence and, ultimately, to defendant. This included a Hayward motel's video of defendant on the morning of the incident wearing the black jacket and requesting an extra room key card, and a gym bag found in his motel room containing indentifying papers. Police found defendant staying at a Los Angeles private residence and arrested him there two days later, in the early morning of Wednesday, October 6, 2010.

Defendant also acknowledges that further evidence indicated he was in Los Angeles two days before the incident, rode up to the Fremont area in a car the day before, and stayed with another man, Fabio Toro, in a room of the motel on the evening of October 3, 2010. He returned to Los Angeles, at least part of the way by bus, on Tuesday, October 5, 2010. When police located him in Los Angeles, defendant gave them a false name. A bus ticket found on his person was also in this false name. He also had several abrasions or bruises to his upper left forehead and several scrapes and scratches, along with some redness, above his chest area.

### Defendant's Interrogation

Defendant was arrested in Los Angeles and taken to a local jail, where two Fremont police detectives, Ricardo Cortes and Jeremy Miskella, interrogated him starting shortly before 1:00 p.m. that same day for about three and a half hours. This interrogation was recorded and played for the jury, and a transcript of it provided to them. We discuss it in detail in the discussion section that follows. Defendant at first denied being in Northern California, but gradually acknowledged he participated in the incident, which he repeatedly and always characterized as an "accident." He eventually said he had taken a parked white van in order to sell it and, while driving it, hit a motorcycle as he tried to turn. He denied knowing he hit a police officer. He acknowledged that he fled, saying he was afraid of being arrested. He also said he had a serious drug problem,

6

having used crystal methamphetamine all day Sunday, and referred to his drug use in discussing the accident and his confusion.

### Other Relevant Court Rulings

After the presentation of evidence, defendant moved again to suppress the statements he made during his interrogation, this time on the ground that his statements were improperly coerced and, therefore, involuntary. The trial court denied the motion because his statements were not the product of coercion or undue influence. The court also concluded that defendant did not unambiguously invoke his right to remain silent, although, the court noted, the motion was not based on that argument.

Defendant objected to the People's request that the trial court, in addition to giving the jury the standard instruction regarding attempted murder that is willful, deliberate, and premeditated, CALCRIM No. 601, instruct it that the People did *not* need to prove defendant "maturely and meaningfully reflected upon the gravity of his or her act," as stated in section 189. Defendant argued this placed undue emphasis on this part of the law to his prejudice. The court disagreed and gave the instruction.

### Verdict and Sentencing

During the jury's deliberations, the foreman asked the court for, and received, clarification regarding the difference between its instructions regarding attempted murder, contained in CALCRIM No. 600, and attempted murder that is willful, deliberate, and premeditated, contained in CALCRIM No. 601. The jury found defendant guilty on all charges and found true the allegations that the attempted murder was willful, deliberate, and premeditated, defendant inflicted great bodily injury, and he personally used a deadly weapon in the commission of the attempted murder. The court subsequently sentenced defendant to a total term of 21 years and 4 months to life.

Defendant filed a timely notice of appeal.

### DISCUSSION

### I. *Defendant's Second Motion to Suppress His Interrogation Statements*

Defendant argues the trial court erred in denying his second motion to suppress his interrogation statements, made after the presentation of evidence at trial. He contends

7

that he repeatedly and unambiguously invoked his right to remain silent, but that Cortes and Miskella ignored his invocations and instead employed improper, coercive psychological methods that resulted in him making involuntary, prejudicial statements. The People disagree on all points. We agree with the People.

## A. *Defendant's Interrogation*

We review the interrogation in detail in order to address defendant's contentions. Before defendant was brought in, Cortes mentioned to another person that "somebody" said the "suspect's a little dingy sometimes." Defendant entered, wearing only shorts and shoes, indicated he was cold, was uncuffed, and sat down. He spoke in English and Spanish; Cortes spoke to him in Spanish most of the time, but Miskella, who said he did not speak Spanish, spoke English to defendant, with Cortes sometimes translating for him and/or defendant. Miskella left the room at times, and Cortes and defendant then spoke mostly in Spanish.

Defendant readily answered initial questions about his background. He said he was from Cuba, was in school up to the 10th grade, 36 years old, in the United States for 16 years, homeless and unmarried, living on the streets of Los Angeles, and the father of a 14-year-old son who did not live with him.

After defendant said he preferred to talk in Spanish, Cortes advised him in Spanish of his *Miranda* rights, including his right to remain silent. Asked if he understood each of his rights, defendant readily indicated that he did. The detectives then continued their questioning of him.

Defendant said he could not remember what he had done the previous Saturday or what day of the week it was. He volunteered that his life was "a disaster," he had a serious drug problem from using crystal methamphetamine and marijuana, and his issue was "being on drugs and being confused."

He denied knowing Fabio Toro or going to Northern California, said he had been in downtown Los Angeles, and asked what was going on and how he could "win" and "lose." He then said, "Look, if there are things—look, I—I'm not going to lie to you. I'm just going to keep quiet and I'm going to answer you when I can answer and if I

8

can't, I'm going to keep quiet.  Give me that right."  He continued, "You are very serious people, very hard-working people and I'm not going to play with your mind, (unintelligible) because that's impossible. . . . I'm not going to lie to you and I don't want to make light of what you are doing (unintelligible) do you understand me?  So I—I prefer to keep quiet if I have to keep quiet."

The detectives continued questioning defendant.  He was told he was arrested for attempted murder, someone had almost died, and pressed to say what had happened from Sunday to Tuesday.  Defendant answered questions, asked some of his own, and insisted he had been in Los Angeles.  As the detectives pressed, he said he felt harassed by them; asked to explain, he said, "Because you are a man and, and I don't want to lie to you."  He said he was a "sinner," discussed his troubles, and said, "how can I defend myself from this because anything I say here will only damage me."  Nonetheless, he continued to talk.  He said he did not know what had happened on Monday, he would accept the detective's judgment of him if they had evidence against him, his life was lost, he had lost all hope, and he had asked for his son's forgiveness while in his jail cell.

When the detectives pressed defendant to tell them about Toro, defendant said, "Please—please don't put me on a cliff like that."  Told about the Hayward motel video, he acknowledged he had "seen" Toro, and said, "Yes, no uh . . . I don't wanna—I don't wanna talk because who else I might be hurting.  I don't know if I'm hurting somebody else. . . . If I have to pay I am responsible, I will pay for it," but "I don't want somebody else in complications."

Pressed more, defendant said, "I'm not—I'm not going to say, 'I did this, I did that.'  Make me an offer . . . ."  Told he should tell his story to avoid the impression, including by the district attorney and the victim, that he was a "cold-blooded killer," defendant acknowledged the incident occurred, said he was a "good person," asked what Toro had said about him, and said, "I'm guilty for what occurred Monday."  Pressed further to tell what had happened and why, defendant said, "I don't want to," and instead summarized the charges against him, insisted he had not hurt anyone, and said he did not drive and had no car.  Told he had been seen driving a white van, defendant said, "I want

9

help." After the detectives encouraged him to be a "man" and tell the truth, defendant asked how many years he would be in jail. Told they had nothing to do with that, he said he was never going to get out; asked to explain what happened, he said his word was worthless and no one would believe him.

Pressed further, defendant said, "It was an accident," denied he was a murderer, and said he only knew that he had not hurt anybody. Told someone had gone to the hospital, he said, "I knew that I was ending my life," that he had broken his promise to Christ to change his life, and that he was sorry. He insisted it was an accident; after he was told the person injured had a broken leg and lost three toes, he indicated he was scared and not a cold-blooded killer.

Pressed further about what happened, he said, ". . . I don't want to talk about it. Like I told you, sir, if I say something here, it's only going to hurt me," insisted he had not lied, and said he would "rather keep it quiet." He said he wanted help "so I may be able to hug my mom again," and again asked for "an offer." He was told that was not the detectives' role, but persisted. He said he did not want to spend the rest of his life in jail and the detectives were the only ones who could help him. He continued to ask how many years he would spend in prison "for that kind of accident" and for help. Cortes said he did not know what would happen to defendant, and told him that if he did not tell his story, it would be assumed that he was "cold-blooded."

Defendant asked what "police officer[s]" thought and Cortes said "[a] lot of police officers think that you did it on purpose." Defendant expressed fear that the police would hurt him for injuring an officer. As Cortes pressed for more information, defendant repeatedly asserted that it was all an accident. Asked if he knew it was a police officer, he said "[n]o"; asked what he saw, he asked for a moment to reflect, said everything was very confusing, that "[e]verything is like an accident," and referred to drug use. He denied hitting the officer. When Cortes insisted that "[w]e need to know the truth," defendant said, "[y]es, yes. It's not for case, for work. You must be patient because it's my life." He again said it was an accident, and said, "I took off but I wasn't driving."

Told witnesses identified him as the driver, defendant said, "I prefer to maintain silence . . . ." Miskella interrupted him, saying, "Stop, stop. Answer me yes or no in English." In the resulting back and forth, defendant asserted, "Sir, uh, I prefer uh, no say nothing. It's no problem?" Miskella asked defendant if he preferred to say nothing "[t]o that question," and defendant said, "Yes," and that he did not want to "offend" Miskella, who, defendant said, was "very angry." When Cortes pressed, defendant said, "But do you remember that—that I told you 'no' from the beginning?" Cortes responded that it was "okay if you don't want to talk to us," but continued to press for information, encouraging defendant to "[b]e the good guy." Defendant said he was scared and preferred to say nothing, "but" did not want to lie. Pressed further, defendant said he was afraid. He asked for water, and Cortes said he would talk to Miskella when he returned, but there is no indication defendant received any.

Defendant continued to talk. He asserted it was an accident and expressed a fear that officers would harm him for injuring an officer. Cortes said repeatedly that he would protect defendant. He also said, "I want to put you in a car and get you out of here," but that he did not have anything to tell the injured officer after two hours other than it was an "accident." Defendant then said, "I would like to confess everything to you."

Defendant answered questions for the remainder of the interrogation. He gave additional details of the incident, at times while holding Cortes's hand for comfort. Cortes promised he would "help" him and assured defendant that he did not "want anything to happen" to him. Defendant again said it was an accident and that he had wanted to escape, expressed regret, said he prayed to God for his sins, and asked Cortes to promise he would not get a life sentence. Cortes said he would personally talk to the deputies when they went back, would "be with you as much as I can," and would not "abandon" defendant.

Defendant, after again saying he would be in jail for the rest of his life, said, "I drove a van. God help me. I tried to make a turn and when I turned I hit the man." He said he "took" the parked van by himself, intending to sell it. He hit someone, though it was "gentle," did not know it was an officer, and took off, fearing arrest. He saw the

11

motorcycle and applied his brakes, but could not to avoid the collision. He left a cell phone in the van (he also identified himself to Cortes in a photograph taken from the phone found in the van). He hid in the hills and later crashed his head into a wall. He returned to Los Angeles, and had not slept for some time.

Asked if he used crystal methamphetamine upon returning to Los Angeles, defendant said he did not have any more, was "clean" and that his system cleaned itself out, used marijuana the day before, did not use drugs Monday, and used crystal methamphetamine all day Sunday. He said he had stayed in the Hayward motel, but would not identify Toro. He asked again for a glass of water, but did not receive one. He did not remember a black jacket, but it was possible one could be his. Told computer data taken from the van showed he did not apply the brakes during the collision, he said he did not remember, but "logic" indicated he did. Miskella suggested he write the injured officer a letter, and defendant did so, writing that it was an accident. After some additional discussion about his safety and what prison sentence he might receive, the interrogation ended.

## B. *The Proceedings Below*

After the presentation of evidence, defendant's counsel moved to suppress defendant's statements to police as involuntary. She argued, "The fact that my client was dingy, that he asked for water, the fact that he—there's no indication as to whether or not he had had sleep or food or any rest, and he clearly stated that he had used drugs all day Sunday and it lasts for three days. So I'm not quite sure about the time frame of the taking of the—or the start of the interrogation, but it could have indicated that my client was still feeling the effects of the drugs at the time that he was being interviewed. [¶] So on that basis, I'd just object that the consent or the entire statement was involuntary."

The prosecutor contended defendant's initial indication that he would answer some, but not all, questions showed he was very familiar with his right to remain silent, and that defendant never sought to terminate the interview, talking with the detectives, and particularly Cortes, throughout.

12

The court continued the hearing to review matters until the following day. Asked if she was arguing defendant invoked his right to remain silent, she said she thought that she had previously referred to his twice saying, " 'I don't want to answer that,' " but said, "for the sake of argument, I think it's—I don't think it's worth adding to the arguments previously made. I think it's more as to his mental condition." The prosecutor added that the interrogation video showed defendant "was very much aware of the interview and what was happening and responding to the officers."

The court stated for the record that defendant's motion was not made on the basis that defendant had invoked his right to remain silent but, to the extent it was, defendant had not done so "absolutely, unequivocally and unambiguously," and any references he made to remaining silent were "very question specific about certain issues related to the case," such as when he did not want to answer questions about Toro.

The court also ruled that, upon considering the totality of the circumstances, defendant's state of mind was such that his statements were voluntary. It found defendant had received a *Miranda* warning, the interrogation was not unduly long, defendant was "perfectly capable" of interacting and responding to questions, although he was somewhat evasive and nonresponsive at times, the conversation flowed for the most part, the detectives did not exert undue pressure or influence, and defendant's request for water was not consequential.

## C. *Analysis*

### 1. *Defendant's Claim That He Did Not Waive His Right to Remain Silent*

Defendant argues he did not impliedly waive his *Miranda* right to remain silent. We disagree.[2]

The prosecution has the burden of proving by a preponderance of the evidence that the defendant knowingly and voluntarily waived his *Miranda* rights. (*People v. Whitson*

---

[2] Although, as our summary of the proceedings below indicates, defendant's second suppression motion was not based on this ground, the People do not argue forfeiture. Therefore, we address the merits of defendant's argument. The parties do not dispute that defendant did not expressly waive his right to remain silent.

(1998) 17 Cal.4th 229, 248.)  "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 (*Berghuis*) [suspect implicitly waived his right to remain silent when he began answering questions after remaining silent for nearly three hours].)

A person must invoke his or her right to remain silent unambiguously.  "A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity.  [Citation.]  If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'  [Citation.]  Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity."  (*Berghuis*, *supra*, 560 U.S. at pp. 381-382 [a mid-interrogation invocation of the right to remain silent must be clear and unambiguous].)

"[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' "  (*North Carolina v. Butler* (1979) 441 U.S. 369, 374-375.)  In order for an implied waiver to be found, a court must determine that the person relinquished the right based on free and deliberate choice rather than intimidation, coercion, or deception and with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it.  (*Moran v. Burbine* (1986) 475 U.S. 412, 421, 422-423; *People v. Whitson*, *supra*, 17 Cal.4th at p. 247.)

As the reviewing court, we accept the trial court's resolution of disputed facts if supported by substantial evidence, but independently decide whether the challenged statement was voluntary.  (*People v. Gonzalez* (2012) 54 Cal.4th 1234, 1269.)  When the interview is recorded and the facts surrounding the giving of the statement are undisputed, as is the case here, we may independently review the trial court's determination of voluntariness.  (*People v. McWhorter* (2009) 47 Cal.4th 318, 346.)

14

Accordingly, we must determine whether defendant impliedly waived his right to remain silent and, if so, whether he unambiguously asserted this right at any time during the interrogation. Defendant argues he made no implied waiver before confessing to the crimes in question. He contends that, contrary to the trial court's apparent view that he sought only to selectively remain silent, he repeatedly said he did not want to answer questions that would be harmful and against his interests.

We disagree. Having watched and listened to the interrogation, and reviewed the transcript of it, we conclude defendant impliedly waived his right to remain silent and never unambiguously asserted it during the interrogation.

Defendant impliedly waived his right to remain silent when, after indicating he understood each of his *Miranda* rights, he continued to answer the detectives' questions. Almost immediately, he volunteered pertinent information, telling the detectives that he had a serious drug problem that he would later link to his conduct in the incident. Asked if he knew Toro, defendant did not invoke his right to remain silent. Instead, he only indicated that he would answer some, but not all, questions, without further explanation. Told he was charged with attempted murder, he insisted he had been in Los Angeles. He did ask "how can I defend myself from this because anything I say here will only damage me," but continued to talk about pertinent matters. He denied knowing what had happened on Monday and again insisted he had been in Los Angeles. When the detectives again pressed him about Toro, he asked them not to put him "on a cliff like that," but only because he did not want to implicate others.

As the detectives revealed more evidence to defendant and honed in on his actions during the incident, he indicated he did not want to answer the questions posed *and* continued talking. He characterized himself sympathetically, asked about the evidence and charges against him, solicited the detectives' help, described the incident as an "accident," said he had not hurt anyone and was not a cold-blooded killer, indicated he was a religious man, asked for an offer, indicated he would take responsibility for his actions but that he did not want to spend his life in prison, and told the detectives they were the only ones who could help him. At one point, as Cortes continued to press him

15

for information, defendant paused for a moment to gather his thoughts, telling Cortes, "[y]ou must be patient because its my life," then repeated that it was an accident and said he was not driving. In short, having waived his right to remain silent, he did not unambiguously invoke it. To the contrary, he chose to continue talking with the detectives, albeit while avoiding answering certain questions, in an apparent attempt to influence their view of him and the incident in order to limit the charges against him and his possible prison sentence.

Having said this, we are concerned with a particular point in the interrogation when Miskella appears to bully defendant for resisting answering whether or not he was the driver of the van. When told witnesses identified him as the driver and asked to confirm this was the case, defendant said, "I prefer to maintain silence . . . ," at which point Miskella interrupted him, saying "[s]top, stop. Answer me yes or no in English." Such an effort to override defendant's will, if in fact he were asserting his right to remain silent altogether, would be inappropriate. However, the totality of the circumstances, including the dialogue that followed this exchange, make it at the very least ambiguous that defendant was invoking this right. As defendant continued to assert that he would prefer to "say nothing," Miskella asked him if he means to the particular question asked, and defendant agreed. Defendant went on to reference what he had said at the beginning of the interrogation—an obvious reference to his initial indication that he would answer some, but not all questions. Thus, we conclude that he did not indicate he wanted to end the interrogation altogether when he said he wanted to "maintain silence" in response to the question of whether he was driving the van.

In short, we conclude defendant's argument lacks merit.

### 2. *Defendant's Claim That His Statement Was the Product of Coercion*

Defendant next argues his interrogation statements were the involuntary products of the detectives' improper coercion. Specifically, he contends they took advantage of his "unique psychological difficulties" and prior experience. They unduly coerced his statements by threatening "to charge him with whatever serious crime they wanted" and

16

implying "that they would protect him from physical harm by other police officers only if he confessed." We again disagree.

" 'In general, a confession is considered voluntary "if the accused's decision to speak is entirely 'self-motivated' [citation], i.e., if he freely and voluntarily chooses to speak without 'any form of compulsion or promise of reward. . . .' [Citation.]" [Citation.] However, where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law.' [Citation.] 'A confession is "obtained" by a promise within the proscription of both the federal and state due process guaranties if and only if inducement and statement are linked, as it were, by "proximate" causation.' " (*People v. Tully* (2012) 54 Cal.4th 952, 986.) However, "[i]nsofar as a defendant's claims of involuntariness emphasize that defendant's particular psychological state rendered him open to coercion, . . . '[t]he Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." ' " (*People v. Smith* (2007) 40 Cal.4th 483, 502.)

Defendant first points to Cortes's statement prior to the interrogation that someone had told him defendant was "dingy sometimes." We fail to see how such a vague, offhand remark about hearsay has any consequence here. Defendant appeared in the recorded interrogation to be perfectly capable of discussing matters with the detectives. Defendant also contends defendant's purported prior experiences with police brutality in Cuba contributed to his vulnerability, but this too is unpersuasive because he does not establish the detectives had knowledge of such experiences, if in fact they occurred.

Contrary to defendant's assertion, the detectives did not coerce any statement from defendant by suggesting they would charge him with "whatever serious crime they wanted" if he did not talk. Rather, responding to defendant's questioning, they told him he was charged with attempted murder and indicated that many considered him to be a "cold-blooded killer." As we will further discuss, the evidence (virtually all of which the detectives' statements indicate they were aware of when they interrogated defendant)

17

merited such a characterization. Defendant fails to establish the detectives did anything improper by telling defendant of the potentially very serious nature of the charges that could be brought against him under the circumstances of this particular case, and telling him he might be able to aid his own cause by explaining why he had run over Brower.

Also, defendant's contention that Cortes promised to protect him from other officers only if he confessed is not supported by the record. Cortes responded with professionalism, assuring defendant that he would protect him from any harm from other officers without qualification. Defendant points to nothing to the contrary, nor does he provide any legal authority that suggests Cortes was required to stop his interrogation because of defendant's fear.

Defendant makes a number of other arguments in his reply brief that relate to his coercion argument. These include that the interrogation was lengthy, in uncomfortable settings, occurred as he purportedly was still coming off a "crystal high," and was conducted by detectives with a supposed awareness and exploitation of the swift and brutal justice system of Cuba, defendant's claimed homeland. We only summarily address these untimely arguments (*Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3 ["[p]oints raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before"]) because they too are unpersuasive in the face of the record. Defendant said he had not taken crystal methamphetamine since Sunday and was "clean;" he does not appear uncomfortable during the interrogation regardless of his initial indication that he was cold and his unhonored request for water; the interrogation was conducted in the middle of the day and was not unduly long; and the detectives' tactics, except perhaps for the momentary bullying by Miskella that we have already noted, were not inappropriate.

### 3. *Any Error Was Harmless*

Defendant argues that the court's improper denial of his motion to suppress was prejudicial because it contributed to the jury's determination that he was guilty of attempted murder that was willful, premeditated, and deliberate, despite weak evidence that this was the case.

18

A violation of a defendant's *Miranda* rights is not prejudicial if it is harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310; *Chapman v. California* (1967) 386 U.S. 18, 24.) Assuming for the sake of argument that the trial court erred in denying defendant's motion to suppress, it would be harmless under this standard for four reasons.

First, in our view, to the extent defendant has any argument (albeit a losing one), it is that *after* Miskella interrupted his assertion that he preferred to remain silent to insist that he say whether or not he was the van driver, his statements were involuntary. Defendant's previous refusals to answer questions were unquestionably question-specific and surrounded by defendant's freely talking with the detectives, telling them at first he had been in Los Angeles only, then insisting the collision was an accident, he was not the driver, and he did not hurt anyone. The essence of defendant's prejudice argument is that the jury convicted him of attempted murder that was willful, deliberate, and premeditated because of the prosecutor persuading it he had lied during the interrogation. Even if the court had erred in admitting defendant's statements after Miskella's interruption, the prosecution would have had ample ammunition to make this same argument based on defendant's earlier statements.

Second, contrary to defendant's contentions, the prosecution did not rely on his interrogation statements, or their falsity, to argue he was guilty not only of attempted murder, but of attempted murder that was willful, deliberate, and premeditated. The portions of the prosecutor's closing argument highlighted by defendant reflect the prosecutor's efforts to argue defendant had attempted to murder Brower, not that he had done so in a premeditated and deliberate way.

Third, the evidence of defendant's interrogation was, if anything, supportive of his position at trial—that the incident had been an accident. Indeed, the defense presented no evidence, but argued defendant had hit Brower by accident. The only evidence of this was defendant's repeated insistence that it was an accident during the interrogation. The defense also argued defendant's drug use affected him at the time of the incident, which also was supported only by his interrogation statements. Further, defendant's appearance

19

in the interrogation served to humanize him, as he appeared remorseful and scared, whether or not he made self-serving and false statements about the incident.

Fourth, and perhaps most importantly, there was ample evidence independent of defendant's interrogation statements to support the jury's verdict. As we will discuss, defendant's actions, as testified to by Brower and the two other eyewitnesses, and further supported by the computer data taken from the van's air bag module, are more than sufficient to demonstrate that he attempted to murder Brower in a willful, deliberate, and premeditated manner.

Defendant also contends that his interrogation statement provided the determinative evidence that he stole the van, rather than took one that had been abandoned. Nonsense. The testimony of the van's owner and defendant's conduct established that he stole the van, regardless of his interrogation statements.

In short, defendant did not suffer prejudice under the federal standard from any error the court may have made in denying his motion to suppress.

## II. *The Evidence of Willfulness, Deliberation, and Premeditation*

Defendant next argues there was insufficient evidence that his attempted murder of Brower was "willful, deliberate and premeditated" and, therefore, we must reverse the jury's finding that he did so. Again, we disagree.

We will not discuss at any length whether or not there was substantial evidence that defendant acted "willfully" to kill Brower. As the jury was instructed, "willful" means "intentional." (CALCRIM No. 601.) The testimony of Brower and the two other eyewitnesses, Bullis and Kaufman, and other evidence, such as the computer data taken from the van, provide ample evidence that defendant intended to kill Brower. When he saw Brower stopped north of him and observing him, defendant did a double take, stared directly at Brower, turned his wheels from pointing southbound to pointing northbound, crossed two traffic lanes on Warm Springs Boulevard on a 45-degree angle, and rammed directly into Brower and his motorcycle. He then continued to accelerate across three more traffic lanes until just before the van, motorcycle, and Brower collided with a light pole on the far curb about 68 feet from the point of the initial collision. The undisputed

20

evidence further indicates defendant made no effort to turn or avoid the collision, and never applied his brakes. There is no question there was substantial evidence that defendant acted willfully to kill Brower.

We next consider defendant's arguments that there was not substantial evidence of deliberation and premeditation.

## A. *Relevant Legal Standards*

As defendant points out, " ' "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." [Citation.]' [Citation.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citation.]' " (*People v. Lee* (2011) 51 Cal.4th 620, 636.) Furthermore, as we will discuss further in addressing defendant's claim that the court gave an improper jury instruction, "[t]o prove the killing was 'deliberate and premeditated,' it shall *not* be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (§ 189, italics added.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our Supreme Court determined that evidence sufficient to sustain a finding of premeditation and deliberation generally falls into three basic categories: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; [and] (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant

21

must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id*. at pp. 26-27.) The court further stated that "[a]nalysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id*. at p. 27.) Also, the court later explained in *People v. Lee* that these three *Anderson* factors " 'are not exclusive, nor are they invariably determinative. [Citation.] " ' "*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." ' " ' " (*People v. Lee*, *supra*, 51 Cal.4th at p. 636.)

"When a defendant challenges the sufficiency of the evidence, ' "[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citations.] 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " ' " (*People v. Clark* (2011) 52 Cal.4th 856, 942-943.) Furthermore, we, as the reviewing court, need not conclude there was evidence beyond a reasonable doubt to support the verdict. Rather, the test is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) We affirm the conviction "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

22

**B.** *Analysis*

Defendant argues there was not substantial evidence to support a finding of premeditation and deliberation based on two categories of contentions, neither of which is at all persuasive because they in effect ask that we either reweigh the evidence presented at trial or consider contentions that are unsupported by the record.

A rational finder of fact could conclude that defendant acted with premeditation and deliberation beyond a reasonable doubt, even though the incident occurred in a very short amount of time, based on the evidence presented at trial and the reasonable inferences that can be drawn from it. Together they support findings that defendant stole the van and was competently driving it, having stopped at the end of an alleyway by Warm Springs Boulevard and turned the car's wheels southbound, in the direction of a nearby freeway entrance, as he waited to make a turn onto the Boulevard. He saw and recognized a motorcycle police officer, Brower, stopped in the middle of the Boulevard observing him. Defendant realized he had to change his escape plan. Rather than turn southbound onto the Boulevard, he decided to kill Brower and flee. By doing so, Brower would neither follow him nor report his whereabouts to other officers. Defendant turned the van's wheels and accelerated directly into Brower and his motorcycle. He knocked both over and floored his accelerator in order to drive Brower back across the Boulevard and into a light pole on the far curb, hoping to cause maximum harm to Brower. Having done so, and as flames began to spread, he fled, utilizing the wherewithal to evade detection, including his use of a false name, until he was found in Los Angeles two days later.

Defendant ignores this evidence and these reasonable inferences. Instead, he contends the evidence before the jury was that he was "crazy" and "mentally strange," under the influence of crystal methamphetamine at the time of the incident, an inexperienced driver who accidentally hit Brower as things happened quickly and he tried to turn, and fled in a panic. Given this evidence, he argues, he had no opportunity to reflect sufficiently to establish premeditation and deliberation.

23

These contentions, however, are mostly based on defendant's uncorroborated interrogation statements (showing again the value of these statements to the defense). The jury was not required to believe anything defendant said, particularly given his insistence that he accidentally hit Brower when eyewitness accounts and the path he took indicated he intentionally did so. Indeed, the jury's verdict indicates it found he was not credible.

Also, there was no evidence presented that defendant was "crazy" or "mentally strange." The record only contains Cortes's vague comment that defendant was "dingy sometimes," hardly evidence that he had a mental condition that made him incapable of premeditation or deliberation. And indeed, he proved to be entirely capable of escaping to Los Angeles, and of talking rationally with the detectives throughout his three and a half hour interrogation. Therefore, these contentions provide no support for defendant's insufficient evidence claim.

Second, defendant contends that the objective evidence established that the van traveled a total of 112.9 feet in five seconds, from its starting point in the alley to its ending point against the light pole, at speeds ranging from 10 to 19 miles per hour. According to defendant, this objective evidence and his conduct showed only that "[defendant] engaged in a panicked and reckless behavior at a speed that never exceeded 19 miles per hour. In other words, he was traveling at speeds that have been shown almost never to result in fatal injury to pedestrians after collision with vehicles. As such, [defendant's] conduct [was not] the result of willful, premeditation and deliberation, but of panic and intoxication consistent with only 'a sudden random "explosion" of violence.' [Citations.]" (Fn. omitted.)

These contentions are unpersuasive. Nothing in the record indicates defendant was traveling at a speed shown to "almost never" result in a fatal injury. Also, defendant's reference to "pedestrians" ignores that substantial evidence indicates he knocked Brower down so that he was caught under his motorcycle and then accelerated as much as he could in order to push both back dozens of feet into a light pole. These actions, common sense informs us, were capable of causing fatal injuries to Brower.

24

Defendant also ignores that there is substantial evidence that, far from being a "random" explosion of violence, defendant's actions were calculated, intended to enable his avoiding arrest for stealing the van.

### III. *The Court's Jury Instruction Regarding Premeditation and Deliberation*

In addition to giving the jury the standard instruction on attempted murder with willfulness, deliberation, and premeditation, CALCRIM No. 601, the trial court added to the instruction, at the prosecution's request that, pursuant to section 189, "[t]o prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his act." Defendant argues that, as a result of this added instruction, the jury was reasonably likely to find he committed a murder that was willful, deliberate, and premeditated "without making separate findings regarding the elements of attempted murder and the elements of the willful, premeditated and deliberate sentencing enhancement." Doing so, he contends, violated his federal due process right to have every element proven beyond a reasonable doubt, requiring reversal of his conviction for attempted murder and the sentencing enhancement that the murder was willful, deliberate, and premeditated.

In evaluating a claim of instructional error, we examine the challenged instructions to determine "whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts." (*People v. Kelly* (1992) 1 Cal.4th 495, 525.) An instruction is confusing only if we determine, after considering the court's entire charge to the jury, that there is a reasonable likelihood that the jury misconstrued the instruction. (*People v. Harrison* (2005) 35 Cal.4th 208, 251-252.)

Defendant's argument is utterly unpersuasive. As he acknowledges, the added jury instruction is taken directly from section 189 and is a correct statement of law.[3] As he also acknowledges, in *Smithey*, *supra*, 20 Cal.4th 936, our Supreme Court rejected a very similar claim. There, the prosecutor persuaded the trial court to modify CALJIC

---

[3] The Legislature added the language to section 189 to abrogate *People v. Wolff* (1964) 61 Cal.2d 795, 819-822. (*People v. Smithey* (1999) 20 Cal.4th 936, 979 (*Smithey*).)

No. 8.20, which defined premeditation and deliberation, by adding the same language from section 189. The defendant objected to the modification as reasonably likely to confuse the jury about the mental state required for premeditated and deliberate murder. The defendant argued the language lowered the prosecution's burden of proof and denied him the right to have the jury determine the mental state elements of the charged offenses and special circumstances in violation of his state and federal constitutional rights. (*Smithey, supra,* at pp. 979-980.)

Our Supreme Court rejected these arguments. It recognized the longstanding rule in California that an instruction in the language of a statute is permissible when the statute's meaning is adequately conveyed in words that are not technical and understood " 'in common parlance.' " (*Smithey*, *supra*, 20 Cal.4th at pp. 980-981.) It concluded the terms " 'maturely and meaningfully reflected' " met this standard, and that there was no indication that the jury was confused by these terms or by the instructions as a whole. (*Id*. at p. 981.) Among other things, the court held that the instruction given pursuant to CALJIC No. 8.20 "made clear that reflection must have preceded commission of the crime and could not have been unconsidered or rash, but rather must have resulted from careful thought and a weighing for and against the chosen course of action." (*Ibid*.) It concluded there was no reasonable likelihood that the jury believed otherwise. (*Ibid*.)

Here, the trial court also instructed the jury pursuant to CALCRIM No. 601 as follows:

"The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved."

Defendant does not dispute the correctness of this instruction either.  Given its correctness, and its similarity to the instruction given in *Smithey*, we conclude that there was no reasonable likelihood the jury was confused regarding its instructions on premeditation and deliberation.

Defendant attempts to distinguish the present circumstances from those in *Smithey* by pointing out that the jury asked questions of the court during deliberations regarding the relationship between the "two elements" of attempted murder and "the willful, deliberate and premeditated part."  After the court provided clarification, the jury foreperson asked for, and received further clarification on applying CALCRIM No. 600, regarding attempted murder, and CALCRIM No. 601.  These jury questions did not demonstrate any confusion, however, between CALCRIM No. 601 and the court's additional instruction taken from section 189.  Therefore, they do not provide support for defendant's argument, which we conclude lacks merit.

Also, even if the trial court had erred, it would not have been prejudicial, whether evaluated under the state or federal standard for prejudicial error.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 [state]; *Chapman v. California*, *supra*, 386 U.S. at p. 24 [federal].)  As we have discussed, the People presented substantial evidence that defendant attempted to kill Brower in a willful, deliberate, and premeditated manner.  The defense did not effectively dispute this evidence, presented none of its own, and argued that defendant accidentally hit Brower without addressing whether, if the jury found he attempted murder, it should find it was not deliberate and premeditated.  The jury found this "accident" claim was not credible for good reason, given that defendant went out of his way and across two traffic lanes to ram directly into Brower and his motorcycle, accelerated after impact, drove Brower and his motorcycle back across three more traffic lanes and into a light pole without braking, and left as flames began appearing.

### IV.  *Defendant's Ineffective Assistance of Counsel Claim*

Finally, defendant presents the novel, if somewhat convoluted, claim that his counsel provided him with ineffective assistance because she failed to request sanctions

and/or appropriate jury instructions regarding the failure of Cortes and Miskella to collect a blood or urine sample from defendant and preserve it, since this sample would have been significant to his defense. According to defendant, because of "[defendant's] repeated statements to detectives about his serious drug problem, the lasting effects of crystal methamphetamine on him, and the accidental nature of the collision," the detectives were required to do so. We disagree.

Both parties acknowledge that the relevant law regarding preservation of exculpatory evidence by law enforcement is summarized in *People v. Roybal* (1998) 19 Cal.4th 481. The *Roybal* court stated, "Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence 'that might be expected to play a significant role in the suspect's defense.' [Citations.] To fall within the scope of this duty, the evidence 'must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' [Citations.] The state's responsibility is further limited when the defendant's challenge is to 'the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' [Citation.] In such case, 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' " (*Id*. at pp. 509-510.)

We need not discuss defendant's ineffective assistance of counsel claim at any length for at least two reasons. First, as the People point out, defendant's claim is not that the detectives should have preserved evidence already in their possession, but that they should have collected it via a blood or urine sample. Defendant does not establish that the law regarding preservation of evidence applies to the collection of evidence and, therefore, fails to show that his trial counsel had any legitimate basis to act. (See *People v. Frye* (1998) 18 Cal.4th 894, 943 ["Although this court has suggested that there might be cases in which the failure to collect or obtain evidence would justify sanctions against

28

the prosecution at trial, we have continued to recognize that, as a general matter, due process does not require the police to collect particular items of evidence."].)

Second, defendant's claim is based on the false premise that defendant's statements to Cortes and Miskella should have put them on alert to collect and preserve a blood or urine sample. Defendant highlights that he told them he used crystal methamphetamine last all day the previous Sunday, the day before the accident and three days before his interrogation, and that it "lasts for three days." However, he neglects to mention that he also told them during this same discussion that he no longer had any crystal methamphetamine in his system, stating, "my system is clean. My system cleans itself." Given his statement, it was not apparent that a blood or urine sample would have exculpatory value and there is no indication the detectives acted in bad faith by not collecting either one.

In short, defendant's ineffective assistance of counsel claim lacks merit. Since we conclude none of defendant's claims of error has merit, we also reject his claim that reversal is necessary based on cumulative error.

# DISPOSITION

The judgment is affirmed.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Richman, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.